UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LAURA MARIA GUEVARA PERUANO, <br><br> Petitioner <br><br> v. <br><br> WESLING, et al. <br><br> Respondents. | ) <br> ) <br> ) <br> ) <br> )    Case No. 26-cv-10300-LTS <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## PETITIONER'S SUPPLEMENTAL MEMORANDUM OF LAW

Petitioner Laura Maria Guevara Peruano ("Petitioner" or "Ms. Guevara Peruano") respectfully submits this supplemental memorandum of law in support of her Petition for Writ of Habeas Corpus. For the reasons set forth below, in the accompanying declarations, and in the existing record, Ms. Guevara Peruano respectfully requests that the Court grant the Petition and order her immediate release from custody.[1]

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Ms. Guevara Peruano is a 31-year-old young woman from Ecuador. When she was twelve years old, she began to frequently convulse, lose consciousness, and become completely disoriented. Doc. No. 3 at ¶ 7. She was diagnosed with epilepsy by a neighbor, and her parents treated her symptoms at home. *Id.* Ms. Guevara did not start receiving proper medical care until she was eighteen years old. *Id.*; Exhibit 2, Declaration of Dr. Altaf Saadi at ¶ 14. Instead, as a teenager, her parents attempted to treat her conditions with herbal medicine and rituals. Exhibit 2

---

[1] On January 30, 2026, this Court ordered Ms. Guevara Peruano's interim release from Respondents' custody while the present Petition was pending. *See* Doc. No. 14.

at ¶ 14. She was told that her seizure events were the work of the devil and that God was punishing her and her parents through her. *Id.* Ms. Guevara Peruano's parents frequently beat her; for example, using a cable to whip her in the back or banging her head repeatedly against the bed. *Id.* at ¶¶ 11-12.

When Ms. Guevara Peruano was in her early twenties, she suffered about four or five severe seizures a day. Doc. No. 23 at ¶ 8. She was also subjected to constant physical abuse by her partner who hit her repeatedly in the head. Exhibit 2 at ¶ 15. This resulted in a six-week stay at a hospital after becoming unconscious from multiple seizures. Doc. No. 23 at ¶ 8. For months after, she was disabled and completely unable to take care of herself. *Id.* at ¶¶ 9-10. Basic tasks, like eating, standing, going to the bathroom, dressing, walking, could only be done if someone was assisting her. *Id.* She started having difficulties with her memory. *Id.* at ¶ 12; *see also* Exhibit 2 at ¶ 27 (finding that Ms. Guevara Peruano demonstrates short-term memory deficits). There were large portions of her life that she was no longer able to remember, including her childhood. Doc. No. 23 at ¶ 12.

The Ecuadoran government labelled Ms. Guevara Peruano as legally disabled, which appears on all her legal documents. Doc. No. 23 at ¶ 11. She was required to have a legal guardian, with no determination to re-evaluate her when her seizures became better controlled. *Id.* at ¶ 11; *see also* Exhibit 2 at ¶ 15. The Ecuadoran government permanently sterilized Ms. Guevara Peruano by force and against her wishes. Exhibit 1, Declaration of Laura Maria Guevara Peruano at ¶ 3; Exhibit 2 at ¶ 15. In 2022, Laura's partner trafficked her to the United States for the purposes of sex and labor. Exhibit 1 at ¶ 3. Her partner physically and mentally abused her, "including subjecting her to forced sexual intercourse, and used her disability as a method to coerce, diminish, and take her agency away." Exhibit 2 at ¶ 17.

On September 14, 2022, Ms. Guevara Peruano was arrested by U.S. Customs and Border Patrol ("CBP") near El Paso, Texas. Doc. No. 19-7. Shortly thereafter, the Department of Homeland Security ("DHS") issued a Notice to Appear and she was placed into removal proceedings. *Id*. She was paroled into the United States and settled in Meriden, Connecticut. On August 5, 2025, Immigration and Customs Enforcement ("ICE") detained Ms. Guevara Peruano. Doc. No. 19-7; Doc. No. 23 a t ¶ 15. She was transferred to Cumberland County Jail ("CCJ") in Portland, Maine. Doc. No. 23 at ¶ 15. While at CCJ, Ms. Guevara Peruano applied for Asylum, Withholding of Removal, and protection under the Convention Against Torture. *See* Doc. No. 23 at ¶ 2. On January 12, 2026, the Immigration Judge granted withholding of removal from Ecuador because it was more likely than not that she was suffer future persecution if returned there. *Id.* at ¶ 3; Exhibit 1 at ¶ 4. The Immigration Judge denied her application for asylum. Exhibit 1 at ¶ 4. Ms. Guevara Peruano timely appealed the asylum denial, which is currently pending at the Board of Immigration Appeals. Exhibit 1 at ¶¶ 4-5.

While detained at CCJ, Ms. Guevara Peruano was receiving medication for epilepsy, anxiety, and depression. Doc. No. 23 at ¶¶ 16-17. There were three different medications that she took each day, always at the same time. *Id.* Ms. Guevara Peruano still suffers seizures even while taking the epilepsy medication, so accommodations were permitted to allow her to sleep on the bottom bunk to minimize risk of injury during an epileptic seizure. *Id.* at ¶¶ 16, 18.

The conditions of Ms. Guevara Peruano's detention became drastically worse. On January 23, 2026, she was transferred out of CCJ with the rest of the ICE detainees with no prior warning. Exhibit 1 at ¶ 6. Guards were shouting and throwing away Ms. Guevara Peruano and other detainees' personal belongings. *Id.* at ¶ 7. No one explained what was happening, which caused a lot of anxiety and panic among the women. *Id.* at ¶ 9. Officers eventually ushered the women

outside, where ICE officials were waiting outside a van. *Id.* at ¶ 9. They put handcuffs around Ms. Guevara Peruano's hands and feet, and wrapped her waist in chains. *Id.* at 10. She was loaded onto the van with other women, and taken multiple hours away to the ICE/ERO field office in Burlington, Massachusetts. *Id.* at ¶¶ 11-12. In the van, the heat was turned up so high that a women fainted. Officers driving the van refused to stop or pull over to make sure she was okay. *Id.* at ¶ 11.

Once at the field office, Ms. Guevara Peruano was crammed into a room, already filled with women. Exhibit 1 at ¶ 12. There was approximately 75 women in this room that was not large enough for everyone to have space to even sit. *Id.* There were only ten mattresses on the ground, which were already claimed by the women already there. *Id.* The room was suffocatingly warm and there was one exposed toilet for the 75 women to share. *Id.* at ¶¶ 12-13. Ms. Guevara Peruano had such a severe epileptic seizure that an ambulance had to be called. *Id.* at ¶ 15.

In the morning, Ms. Guevara Peruano was given only a bottle of water and then once again placed in three-point restraints (handcuffs on wrists and chains on waist and feet). *Id.* at ¶ 18. Ms. Guevara Peruano was loaded onto a bus that, once again, had the heat turned up high. *Id.* at ¶ 19. Ms. Guevara Peruano was then led onto the plane, still in chains, where they were forced to wait for hours before taking off. *Id.* at ¶ 20. Ms. Guevara Peruano had not been allowed to use the bathroom, nor had anyone else who was detained on the flight. *Id.* at ¶ 22. One woman got so sick that she started vomiting blood. *Id*.

Ms. Guevara Peruano finally arrived at the South Louisiana ICE Processing Center at night on Friday, January 23, but the conditions there have also proven to be quite challenging. Exhibit 1 at ¶ 23. When she arrived, she was already feeling unwell from the lack of food, water, and access to a bathroom for several hours. Doc. No. 23 at ¶ 21. For several days, she begged facility staff

for her medications but was ignored. *Id.* at ¶ 23. During each day without medication, she had about five or six seizures every day. *Id.* at ¶ 24. She could not sleep well and felt constantly on edge. *Id.*

Nearly four days after her arrival to Lousian, Ms. Guevara Peruano has finally brought to the medical unit. Doc. No. 23 at ¶¶ 25-26. She took one pill that was given to her by medical staff; she was given no explanation of what the pill was for, but assumed it was her epilepsy medication. *Id.* at ¶ 26. They refused to give her any medication relating to mental health. *Id.* at ¶ 27. Until she was released the following Friday, Ms. Guevara Peruano was given a pill only one other time. *Id.* at ¶¶ 28-31.

## II.   ARGUMENT: THE COURT SHOULD GRANT THE PETITION ON THE MERITS AND ORDER PETITIONER'S IMMEDIATE RELEASE.

### A. <u>The Appalling, Degrading, and Inhumane Detention Conditions That Respondents Have Subjected Petitioner To Violate Petitioner's Rights To Substantive Due Process.</u>

ICE has subjected Ms. Guevara Peruano to appalling, degrading, and inhumane conditions of confinement. These conditions violated Ms. Guevara Peruano's rights to substantive due process. *See also* Doc. No. 1 at 8-9 (asserting that Respondents violated Ms. Guevara Peruano's Fifth Amendment rights based upon inhuman conditions of confinement). On this basis alone, the Petition should be granted and Ms. Guevara Peruano's ordered immediately released from custody. The Due Process clause is intended to prevent the government "from abusing [its] power, employing it as an instrument of oppression." *Davidson v. Cannon*, 474 U.S. 344, 348 (1986); *see also Daniels v. Williams.* 474 U.S. 327, 331 (1986) ("to secure the individual from the arbitrary exercise of the power of government" and "to prevent governmental power from being 'used for purposes of oppression'") (internal citations omitted); *Parratt v. Taylor*, 451 U.S. 527, 549 (1981) (Powell, J., concurring) (due process is intended to prevent the "affirmative abuse of power").

In *Deshaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 199-200 (1989), the Supreme Court stated that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and well-being." According to the Court:

> The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs -- e. g., food, clothing, shelter, medical care, and reasonable safety -- it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. See *Estelle v. Gamble*. supra. at 103-104; *Youngberg v. Romeo*, supra. at 315-316. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. *See Estelle v. Gamble*, supra. at 103 ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met"). In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf -- through incarceration, institutionalization, or other similar restraint of personal liberty -- which is the "deprivation of liberty" triggering the protections of the Due Process Clause.

*Id.* at 200.

These Constitutional principles apply equally to immigrant detainees in civil custody. *See, e.g., Savino, supra; Coreas v. Bounds*, 451 F. Supp.3d 407, 419 (D. Md. 2020) ("a claim by an immigration detainee seeking release because of unconstitutional conditions or treatment is cognizable under [section] 2241") (citing *Aamer v. Obama,* 742 F.3d 1023, 1038 (D.C. Cir. 2014); *Jiminian v. Nash*, 245 F.3d 144, 146 (2d Cir. 2001); *Miller v. United States*, 564 F.2d 103, 106 (1st Cir. 1977) ("Section 2241 provides a remedy for a federal prisoner who contests the conditions of his confinement"); *Hernandez v. Kolitwenzew*, Case No. 20-cv-2088-SLD, 2020 U.S. Dist. LEXIS 97874, *22 (C.D. Ill. 2020) ("[w]henever the government detains or incarcerates someone, it has an affirmative duty to provide conditions of reasonable health and safety").

6

It is well-established that conditions of confinement for civil immigration detainees can support habeas relief where, as here, those conditions violate constitutional standards. *See, e.g., Savino v. Souza*, 453 F. Supp. 3d 441, 450 (D. Mass. 2020) (Young, J.) (addressing unconstitutional conditions for immigrant detainees in the context of the COVID-19 pandemic). In *Savino*, Judge Young summarized the "deliberate indifference" standard as follows:

> The due process guarantee of the Constitution obliges the government "to refrain at least from treating a pretrial detainee with deliberate indifference to a substantial risk of serious harm to health." *Coscia v. Town of Pembroke,* 659 F.3d 37, 39 (1st Cir. 2011) (citing *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S. Ct. 2979, 77, L. Ed. 2d 605 (1983) & *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)). "Proof of deliberate indifference requires a showing of greater culpability than negligence but less than a purpose to do harm," *id*. (citing *Farmer*, 511 U.S. at 835), "and it may consist of showing a conscious failure to provide medical services where they would be reasonably appropriate," *id*. (citing *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)). "To show such a state of mind, the plaintiff must provide evidence that the defendant had actual knowledge of impending harm, easily preventable, and yet failed to take the steps that would have easily prevented that harm." *Leite v. Bergeron*, 911 F.3d 47, 52-53 (1st Cir. 2018) (quoting *Zingg v. Groblewski*, 907 F.3d 630, 635 (1st Cir. 2018) (further citation and internal quotation marks omitted). "This standard, requiring an actual, subjective appreciation of risk, has been likened to the standard for determining criminal recklessness." *Id.* at 53 (quoting *Giroux v. Somerset Cty*., 178 F.3d 28, 32 (1st Cir. 1999)). Courts generally apply the same standard for civil immigration detainees as for pre-trial detainees. *See E. D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019) (stating that "the legal rights of an immigration detainee [are] analogous to those of a pretrial detainee" and collecting cases of other circuits).

*Savino*, 453 F. Supp. 3d at 450-451. *See also Hernandez*, 2020 U.S. Dist. LEXIS 97874, *23 (civil detainees are protected "from harm caused by a defendant's deliberate indifference to the detainee's safety and health") (internal quotations and citation omitted).

A civil detainee may also establish a constitutional violation based on conditions of confinement if they can "demonstrate that their conditions of confinement 'amount to punishment of the detainee.'" *Engelund v. Doll*, No. 4:20-CV-00604, 2020 U.S. Dist. LEXIS 72353, *20 (M.D. Pa. April 24, 2020) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Civil detainees "are

'entitled to more considerate treatment than a criminal detainee, whose conditions of confinement are designed to punish.'" *Yanes v. Martin*, 464 F. Supp.3d 467, 470 (D.R.I. 2020). "They are entitled, as a matter of substantive due process, to 'safe conditions of confinement,' and the government is obligated 'to provide reasonable safety for all residents and personnel within the institution.'" *Id.* (quoting *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982)).

"To determine whether a conditions of confinement amount to punishment, this Court determines whether a condition of confinement is reasonably related to a legitimate governmental objective; if it is not, [the Court] may infer that the purpose of the governmental action is [unconstitutional] punishment.'" *Id.* (quoting *E.D. v. Sharkey*, 928 F.3d 299, 307 (3d Cir. 2019) (internal quotations omitted); *see also da Silva Medeiros v. Martin*, 458 F. Supp.3d 122, 127 (D.R.I. 2020) (finding petitioners had met their burden, including in light of balancing hardships and weighing the public interest, based on "their underlying medical conditions increasing their risk of severe complications from COVID-19"); *Yanes*, 464 F. Supp.3d at 470 ("[C]ivil immigration detainees can establish a due process violation by showing that a government official 'knew, or should have known of a condition that posed an excessive risk to health and failed to take appropriate action.") (internal quotations and citations omitted).

Here, the conditions that ICE has subjected Ms. Guevara Peruano to constitute both unconstitutional punishment *and* represent deliberate indifference. The conditions Ms. Guevara Peruano has experienced, from the Cumberland County Jail in Portland, ME to the Boston ICE/ERO Field Office in Burlington, MA to the South Louisiana ICE Processing Facility, could not possibly serve any legitimate or rational governmental objective. There can be no rational basis for refusing to provide medical treatment when required, withholding medications, forcing a civil detainee to sleep in the cold without adequate bedding, placing a detainee in a holding cell meant

8

to be used for more than 12 hours with so many other women that there isn't room for everyone to sit down through the night much less lie down causing multiple women to faint from the conditions, depriving a civil detainee of adequate food, or keeping a civil detainee locked in jail housing without access to a toilet for hours on end. Ms. Guevara Peruano has experienced all of these things and more. The conditions are not only punishing, but they establish a deliberate indifference by ICE to the well-being of Ms. Guevara Peruano that goes far beyond basic negligence. ICE's detention tactics are intended to force detainees to give up their cases.[2] At a minimum, Ms. Guevara Peruano has been subjected to "objectively unreasonable" conditions that amount to a constitutional violation. *See Hernandez*, 2020 U.S. Dist. LEXIS 97874, *23-24. More accurately, however, Ms. Guevara Peruano unequivocally has been subjected to cruel, degrading,

---

[2] *See, e.g.,* Peleg, The New Yorker, "The Cruel Conditions of ICE's Mojave Desert Detention Center" (Jan. 28, 2026, *publicly available at* https://www.newyorker.com/news/the-lede/the-cruel-conditions-of-ices-mojave-desert-detention-center (last accessed on Jan. 30, 2026) ("But staffing issues do not fully explain the lack of basic medical care at California City. 'They do it so you give up,' Julio Cesar Santos Avalos, who was a detainee at California City from September to November, told me. When he arrived at C.C.D.F., Santos Avalos recalls a consistent push by staff for detainees to sign away their rights and self-deport. Instructions for how to self-deport are displayed prominently near phones where detainees communicate with their lawyers. Santos Avalos and many of the detainees and attorneys I spoke to believe the lack of medical care is part of that push. The detention center is aiming to make conditions so terrible that detainees stop fighting and decide to leave. Santos Avalos, who suffers from chronic pain owing to a foot deformity caused by childhood cases of polio and Guillain-Barré syndrome, was denied his pain medication and made to sleep on a top bunk until he broke under the pressure and self-deported to El Salvador."); Gassama, ACLU, "Detained Immigrants Detail Physical Abuse and Inhumane Conditions At Largest Immigration Detention Center in the U.S.," (Jan. 26, 2026), *publicly available at* https://www.aclu.org/news/immigrants-rights/detained-immigrants-detail-physical-abuse-and-inhumane-conditions-at-largest-immigration-detention-center-in-the-u-s (last accessed on Jan. 30, 2026) ("Human rights organizations, including the ACLU, sent a letter Monday to U.S. Immigration Customs and Enforcement (ICE) detailing accounts of violent assaults and sexual abuse by officers. It also reveals details of other forms of intimidation used to pressure detained immigrants into self- deporting or agreeing to removal to third countries where they have no ties.")

and inhumane conditions of confinement constituting a clear violation of her substantive rights to due process.

Even after this Court twice ordered that Ms. Guevara Peruano receive her epilepsy medication – in a written order on January 23 (Doc. No. 5) and at a status conference on January 27 (Doc. No. 7) – she was repeatedly denied access to her epilepsy medication. She was never given access to the two medications she was prescribed at CCJ for her documented mental health issues.  To this day, Respondents have not explained or attempted to justify their failure to provide Ms. Guevara Peruano with her necessary medication. As a result of their willful neglect, she suffered an increase in epileptic seizures while in detention, putting herself at risk of further damage and harm. The impact of Ms. Guevara Peruano's time in Respondents' custody will follow her, on top of everything she has already suffered in her life. *See* Exhibit 1 at ¶ 31 ("I am also very afraid of the psychological harm I would suffer if I was re-detained. What ICE did to me was traumatizing – it caused a severe increase in anxiety, panic, depression, and seizures. I shake at the thought of being detained by ICE again and what that would do to my mental health and overall wellbeing.").

The government has no valid justification for perpetuating the conditions to which it has exposed and is continuing to expose Ms. Guevara Peruano. Moreover, there is no arguable public interest in ordered a bond hearing and risking Ms. Guevara Peruano's re-detention. She can readily attend her Immigration Court proceedings while not detained. She has dedicated *pro bono* counsel representing her on the merits, and she attests to her full intention to appear in Court as required. Ms. Guevara Peruano's case will not be resolved for quite some time. It will likely take six months or more for the appeal to be resolved if Ms. Guevara Peruano remains detained. *See Jennings v. Rodriguez*, 583 U.S. 281, 328 (2018) (Breyer, J., dissenting) ("[D]etention is often lengthy. The

classes before us consist of people who were detained for at least six months and on average one year. The record shows that the Government detained some asylum seekers for 831 years (nearly 2 & half; years), 512 days, 456 days, 354 days, 319 dats, 318 days, and 274 days—before they won their cass and received asylum."). Accordingly, Ms. Guevara Peruano could easily experience a year or more of detention before her case is concluded.

On the basis of conditions of confinement alone, the Petition should be granted and the Court should order Ms. Guevara Peruano' immediate release. *See, e.g., Hernandez*, 2020 U.S. Dist. LEXIS 97874, *3 (granting petition based on conditions and ordering immediate release); *da Silva Medeiros*, 458 F. Supp. 3d at 130 (granting immediate release and waiving bond requirement).

## III.    CONCLUSION

For all the foregoing reasons, Petition Laura Maria Guevara Peruano respectfully requests that the Court order her immediate release and grant her Petition.

Respectfully submitted,

*/s/ Julia Ciachurski*
Julia Ciachurski
BBO# 709052
PAIR Project
98 N. Washington Street, Suite 106
Boston, MA 02114
(949) 610-3633
jciachurski@pairproject.org

Date:  February 27, 2026                    *Pro bono counsel for the Petitioner*

11

## **CERTIFICATE OF SERVICE**

I, Nicole M. O'Connor, Assistant U.S. Attorney, hereby certify that I served a true copy of the above document, Notice of Appearance, upon all parties of record via this court's electronic filing system.

Date:   January 29, 2026

*/s/ Nicole M. O'Connor*
Nicole M. O'Connor
Assistant U.S. Attorney