

OCTOBER 27, 2025

IN THE MATTER OF: LAURA MARIA GUEVARA PERUANO

DECLARATION OF DR. ALTAF SAADI

## I. Education and Professional Qualifications

### EDUCATION AND PROFESSIONAL QUALIFICATIONS

1. I am a neurologist at Massachusetts General Hospital and Associate Professor of Neurology at Harvard Medical School. I am board certified in Neurology by the American Board of Psychiatry and Neurology and licensed in the states of Massachusetts, Maine, New Hampshire, Kansas, and Missouri. In my current role, I see patients at Massachusetts General Hospital (MGH) main campus, and at the MGH Chelsea Community Health Center; the latter serves a large immigrant population, as well as serving as a refugee health assessment site.  I also serve as a hospitalist Tele-neurology consultant and teach and supervise neurology residents. I have previously also taught medical students at Harvard Medical School and the David Geffen School of Medicine at UCLA and residents at different Harvard and UCLA residency training programs.

2. I am a graduate of Harvard Medical School. I completed a medical internship in Internal Medicine at Massachusetts General Hospital in Boston, Massachusetts. I completed my residency in Neurology at the Harvard Partners Massachusetts General Hospital and Brigham and Women's Hospital in Boston, Massachusetts, where I was also Chief Resident. I completed a two-year research fellowship in health policy and health services research with the National Clinician Scholars Program at the University of California Los Angeles (UCLA), which included completing a master's in health policy and management at the UCLA Fielding School of Public Health.

3. Since 2017, I have been a volunteer for Physician for Human Right's volunteer Asylum Network. I have completed two special trainings in providing medical and psychological documentation for trauma and torture survivors seeking asylum. Additionally, I previously served as volunteer faculty at the UCLA Human Rights Clinic. I co-designed and led an Applied Learning in Advanced Asylum Medicine course, a 12-week curriculum to train other clinicians to conduct effective forensic medical evaluations. Currently, I serve as the Associate Director of the MGH Asylum Clinic. I have authored nearly 100 scholarly publications, with approximately 40 of those focused on immigrants or forcibly displaced populations like refugees or asylum seekers. Put together, I have both significant clinical and research expertise with immigrant and refugee populations. I have submitted approximately 30 affidavits to Immigration Court and USCIS and have been asked to testify in Immigration Court in approximately half of those cases.

4. I have also been asked to assess the medical and mental health conditions and treatment of individuals detained in the custody of U.S. Immigration and Customs Enforcement ("ICE") at facilities across the United States.  I have been a medical expert with Human Rights First, Disability Rights California, National Immigrant Justice Center, and the American Civil Liberties Union of Southern California looking at problems relating to the provision of health care for people in ICE custody.

5. In addition to my volunteer work with Physicians for Human Rights, I have participated in efforts to provide medical services in several underserved communities domestically and nationally including in Zambia, Tanzania, Iraq, Navajo Medical Center in Shiprock, New Mexico, Boston Healthcare for the Homeless, and Medicines Sans Frontiers. In addition to my expertise in neurology, I have also provided services to survivors of rape and sexual assault through the Boston Area Rape Crisis Center from June 2010 to June 2013, where I was a certified rape crisis counselor in Massachusetts, as well as mentor for other counselors.

## II. Executive Summary

6. Laura experienced multiple and recurrent trauma as a child and adulthood in Ecuador, including physical abuse, verbal abuse, forced sexual intercourse, and forced sterilization because of her disability. She met criteria for Post Traumatic Stress Disorder (PTSD) consequent to these traumas. She also has multiple brain injuries (both traumatic brain injury as well as brain injury through oxygen deprivation via strangulation), epilepsy (that was untreated or poorly treated for several years), and demonstrated cognitive impairment on my evaluation. Her memory difficulties are consistent with the biological impacts of prolonged and recurrent childhood trauma, brain injury, PTSD, and recurrent seizures, which can all affect brain development and cognitive functioning. The medical care in Ecuador, including the assignment of permanent legal guardianship during a prolonged hospitalization for recurrent and prolonged seizures, however, appears excessive and paternalistic from a medical standpoint as her disability from epilepsy does not preclude her from being a mother or being able to make decisions for herself.

## III. Medical and Psychological Evaluation

7. I conducted a virtual video evaluation of Laura Maria Guevara Peruano (*DOB: 10/16/1994)* on 10/24/2025. This included assessing her psychological symptoms and cognitive screening. An observer, Ina Nikolli, a research assistant at Mass General Brigham, was present for training purposes. A certified interpreter, Clara Fisher, provided medical interpretation. Ms. Guevara consented to this evaluation.

8. The evaluations consisted of (1) directed interview, (2) psychological and cognitive screening testing. I also reviewed a draft of her affidavit, her medical records, and her criminal records that were provided to me by her attorney. The evaluation lasted approximately 3 hours.

## IV. Trauma History and Symptoms:

9. **Birth history:** Laura Maria Guevara Peruano reported that she was born prematurely and experienced breathing difficulties during the first days of her life. She reported that at birth, her parents initially believed she was dead. However, her aunt noticed slight breathing and insisted she was alive. She was named Laura after this aunt, who is credited with saving her life.

10. **Family history:** She has six "full" siblings. Both her sister and her daughter have epilepsy.

11. She described being raised in an abusive household where she would be beaten by both of her parents, but mainly by her father. She described that her father also beat their mother. Beating included being beaten with their hands or whatever object her father could access around him. She described him using loose electric cables to electrocute her and her siblings, including when they were in water and taking a bath. She described one incident where her father used a cable to whip her- "My back looked like the back of Jesus Christ on the way to the cross" describing how bruised and bleeding her back had become as a result.

12. She described repeated hits to the head as part of the abuse she suffered. For example, she recalled her mother banging her head repeatedly against the bed to the point where she lost consciousness. She described being strangled at the hands of her father, who would choke and lift her as a tactic to scare the other children into following his demands. When she was strangled, she described that her vision would blacken, she would see stars, and she could not breathe well, feeling like she was not getting air in. She described instances where she would refuse food, wanting to die rather than continue her life in the abusive household. However, in these instances, she described that her parents force fed her.

13. Laura described one episode of running away from home with her sister when she was around age 15. They went to the capital city of Quito, where her older sister lived, to look for her. However, they were unable to locate their older sister. Instead, a policeman found them took them to an orphanage. Her parents ultimately came to learn about their whereabouts and came to collect them from the orphanage.

14. Laura began having seizures at around the age of 12 and was not treated for them until around 18 years old. In the interim, her parents attempted to treat her condition with herbal medicine and religious and cultural rituals, including sprinkling holy water to cleanse her of the devil and even eating a cat as part of one ritual. She was repeatedly told that her seizure events were the "work of the devil," that "the devil had entered her," that God was punishing her through them, or that God was punishing Laura's mother through Laura's seizures. Her seizures are described as involving shaking in all extremities. She had no aura or clue preceding the seizure event as a child, though as an adult she reports noticing her hands stiffening before she has a generalized seizure. She has experienced urinary incontinence and tongue bite with the seizures. She described having seizures every three to six months starting at age 12, but these became increasingly frequent.

15. She noted that her seizures became particularly frequent—occuring up to 4-5 times a day—when she was around the age 20-21 years old and was being hit repeatedly in the head by her partner Edwin. She was experiencing seizures at both work and home, prompting her employer to inform her that she could not continue her employment under these circumstances. This led to a prolonged hospitalization. She described her hospitalization as a blur, recalling few details. She reported undergoing numerous medication changes due to recurrent seizures, which were difficult to control. She described that during this time, a doctor said she needed guardianship. There was no determination to re-evaluate her when her seizures became better controlled. She later reported that her disability was used as a pretext to force her into undergoing a tubal ligation without her consent. She described this as a continuing source of trauma, as it represented another instance in which she felt deprived of autonomy and unable to make decisions for herself in her home country.

16. She described abusive relationships with her partners Edwin and Jeferson. These partners physically and mentally abused Laura, including subjecting her to forced sexual intercourse, and used her disability as a method to coerce, diminish, and take her agency away.

17. She described her first year in the U.S. as particularly challenging. When she arrived in the U.S., she described having interruptions in her seizure medications. At one point she contacted her family to send her medications from Ecuador as she could not afford them in the U.S. She was ultimately connected to a community organization that facilitated obtaining her seizure medication at a low cost. She reported that her seizures initially occurred one to two times per month during that period, but their frequency increased to approximately once daily, particularly when she was with Jefferson, as he was physically abusive toward her. She described that her seizure frequency improved when she began to live with her sister.

18. Her first year in the U.S. was further mentally challenging for her because of her separation from her children. She described immense pain from not being able to talk to her children daily and feeling the need to provide for them financially but simultaneously experiencing pressure from Jefferson not to work. He would accuse her of infidelity, that she was flirting with her boss, that she was flirting with the people whose houses she cleaned - "everything anything he would have issues with me working." But she would not listen to his orders to stop working. She explained: "I had to go to work because I need to provide for my children. I am both their mother and their father. I have to be their support." That she would not listen to his orders would infuriate him and subject her to more physical and verbal abuse. Verbally, when she did not listen to his orders, he would become angry and say, "how is a disabled person going to tell me anything?" He would also repeatedly tell her that she was "crazy," "disabled," "you're a nobody because you're a disabled," and that "I own you" because he had brought her to the U.S. ("you came here because of me"). She describes beginning to drink alcohol excessively during that first year due to the verbal and physical abuse she endured from Jefferson. In her words: "he would make me feel very small."

19. Resilience factors: her children are significant motivation factors for her. She described the challenge of not being able to hear the voices of her children while she has been in immigration detention. She described a strong desire to stay in the U.S. and contribute: "In this country, I can be independent, provide for myself. In my country, I cannot do that."

**V. Psychological and Cognitive Assessment**

20. She described frequent nightmares, up to 2-3 nights a week. She described having dreams where she would hallucinate blood and babies, which is also documented in the medical records.

21. She described struggling with repeated, intrusive, and unwanted memories of her past trauma daily. When reminded of these traumatic events, she described feeling very upset as well as having strong physical reactions like feeling chills throughout her body. She described avoiding memories and feelings relating to her prior trauma, as well as avoiding external reminders of the stressful experience.

22. She described constantly getting startled when she hears noises, feeling as if her father is coming. She described how even small sounds remind her of the sound "my father would make on his way to beat us."

23. She described feeling distant and detached from others. She described that the feeling can sometimes result in such a disconnect from reality that she feels like she is separated from her body "like I'm in a different place." She described having hard time feeling positive emotions.

24. She described having strong negative beliefs about herself, other people, and the world, including feelings of guilt and shame. In her words: "I feel guilty for being born a female, for being born with a problem in my head, for letting my daughter see her father beat me, and for having left my children with my parents. I feel guilty they decided for me [referring to forced sterilization], and I don't get the opportunity to be a mother. I would have wanted to have the choice to have more children. I feel incomplete." She continues to experience trauma from her forced sterilization – struggling with thoughts like "I'm incomplete" and "no one will want me," which have been repeated to her by her former abusive partners.

25. She met criteria for Post Traumatic Stress Disorder, according to the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Revision 5 (DSM-5):

    i. The person was exposed to death, threatened death, actual or threatened serious injury, actual or threatened sexual violence, witnessed/learned of death or trauma. Laura's exposure to physical violence as a child and witnessed trauma (through domestic violence and physical violence), meets this criterion.

    ii. The traumatic event is persistently re-experienced as demonstrated by one or more of five examples. The client reports recurrent, intrusive distressing memories of traumatic events, emotional distress and physical reactivity at exposure to cues that symbolize or resemble an aspect of his prior trauma, and frequent nightmares, meeting this criterion.

    iii. Avoidance of trauma-related stimuli after the trauma. She demonstrated avoidance of memories and thoughts.

    iv. Negative alterations in cognition and mood associated with the traumatic event as demonstrated by two or more of seven examples. Laura reported feelings of blame, shame, guilt, feeling unsafe in the world, overly negative thoughts about the world, negative affect, and detachment or estrangement from others.

    v. Marked alterations in arousal and reactivity associated with the traumatic event, as demonstrated by at least two of six examples. Her condition meets this criterion based on reckless behavior (her drinking), exaggerated startle response, and difficulty concentrating.

    vi. Duration of the disturbance of more than one month. Her condition meets this criterion.

    vii. Functional Significance. Her symptoms cause significant distress or impairment in areas of functioning in her daily life.

26. Cognitive screening was performed using components of the Rowland Universal Dementia Assessment Scale (RUDAS), a short cognitive screening instrument designed to maintain validity across cultural and linguistic contexts. The cognitive screening was shortened due to the limited time we had.

27. Immediate and short-term memory (distinguished from immediate memory which is more short-term): She was asked to repeat 4 items on a grocery list. She was able to list 4 of 4 items after three attempts, demonstrated normal immediate memory. After a period of 5 minutes, she was able to recall 3 out of 4 items. She was able to list the fourth word with a category cue (a retrieval cue). Put together, she demonstrates short-term memory deficits which is improved if there is a retrieval cue.

28. Visuospatial orientation: She demonstrated confusion with her right and left sides. Visuospatial orientation refers to the cognitive ability to understand and navigate the spatial relationships between objects in the environment, which was mildly impaired for her.

29. Abstraction: She was able to relate two items together. For example, she was able to identify that a train and bicycle are modes of transportation, or that a drum and a guitar are both musical instruments. This demonstrated normal abstract thinking (a higher-order thinking process that involves the ability to understand and think about more complex concepts).

30. Judgement: When asked how she would cross the street at a location with no pedestrian crossing or traffic lights, she responded she would wait until there were no cars to cross. This showed adequate judgement.

31. Praxis: This test evaluates a person's ability to learn and perform practice tasks and movements and involves asking the individual to alternate their hands in a pattern alternating between 'palm down' and 'fist' actions. She was unable to do this, demonstrating some ability to correct herself, but overall unable perform the simultaneous changing of hands with any synchrony. She had many intrusions and incorrect variations.

32. Language: She was asked to name as many animals and fruit as possible in one minute. She named 7 distinct animals and 7 distinct fruits in 60 seconds, respectively. This is abnormal. We would expect someone with her educational level to be able to name around 11-12 words in each category.

## VI. Diagnostic Considerations, Impression, and Interpretation

33. It is my opinion that Ms. Laura Maria Guevara Peruano was a reliable and believable reporter throughout our interview. **I found no signs of malingering.** Her emotional responses during the interview were consistent with the experiences she related. Her report of symptoms followed a coherent timeline and followed well-characterized patterns seen in patients with epilepsy and survivors of trauma. She did not endorse symptoms indiscriminately (i.e., she did not endorse all the symptoms that I inquired about). She responded to questions without hyperbole or defensive behavior.

34. She has epilepsy and multiple risk factors for this, including premature birth, repeated brain injuries, and electrocution. There may also be a hereditary component given that both her sister and daughter have epilepsy. Her prolonged hospitalization for recurrent and prolonged seizures aligns with what we would describe as "status epilepticus," a condition where a person experiences seizures lasting longer than five minutes or has two or more seizures in a row without regaining consciousness between them. There is increased likelihood of status epilepticus among people whose seizures are not adequately treated, which was the case for her as she did not receive anti-seizure drugs for years. She received both her disability determination and the establishment of legal guardianship during this period. In the U.S., while temporary guardianship may be appropriate during episodes of status epilepticus, such arrangements should be re-evaluated once seizures are controlled and typically do not require permanence. In her case, this reassessment does not appear to have occurred. The assignment of permanent legal guardianship therefore appears excessive and paternalistic from a medical standpoint. Furthermore, although it is well established that individuals with epilepsy—particularly those with a history of poorly controlled seizures—may experience some degree of cognitive impairment[1], this would not be grounds in the U.S. to deny someone the right to have children. Many women with epilepsy safely conceive and give birth, with careful medical monitoring throughout pregnancy to ensure the well-being of both mother and fetus. Finally, her report of stress as a seizure trigger is consistent with what has been described in the literature[2].

35. Laura met criteria for PTSD, consequent to the multiple and recurrent trauma she experienced as a child and adulthood in Ecuador, including her physical abuse, verbal abuse, forced sexual intercourse, and forced sterilization because of her disability. She appears to have possible dissociative subtype of PTSD (i.e., disconnecting from one's thoughts, feelings, memories, or

[1] Novak A, Vizjak K, Rakusa M. Cognitive Impairment in People with Epilepsy. J Clin Med. 2022 Jan 5;11(1):267. doi: 10.3390/jcm11010267. PMID: 35012007; PMCID: PMC8746065.
[2] Espinosa-Garcia C, Zeleke H, Rojas A. Impact of Stress on Epilepsy: Focus on Neuroinflammation-A Mini Review. Int J Mol Sci. 2021 Apr 14;22(8):4061. doi: 10.3390/ijms22084061. PMID: 33920037; PMCID: PMC8071059.

surroundings that can occur after experiencing or witnessing a traumatic event). The disconnection from memories can result in dissociative amnesia, which involves memory loss, particularly of traumatic events. Individuals with dissociative amnesia associated with PTSD may experience more cognitive difficulties than other individuals with PTSD. Notably, memory disturbances are common among individuals with PTSD, with studies showing smaller hippocampal volume among individuals with PTSD.[3] The hippocampus component of the brain helps people to process and retrieve memory. The cognitive abnormalities associated with PTSD include but are not limited to decrements in verbal and autobiographical memory[4], and fragmentation and disorganization in the trauma narrative[5]. This may manifest as gaps in recall of a traumatic event, for example. My own research with U.S.-based asylum seekers found that asylum-seekers with PTSD were nearly 3 times more likely to have memory issues relating to their trauma narrative (including memory gaps of the traumatic event and difficulty establishing a timeline of the trauma experience).[6]

36. On cognitive screening, Laura demonstrated deficits in language, praxis (learning and performing a movement), short-term memory, and visuospatial orientation. Laura also met criteria for probable brain injury, through both traumatic brain injury, or TBI, (because of repeated blows to the head) as well as possible oxygen deprivation through strangulation. Her history of prolonged and recurrent childhood trauma, brain injury, PTSD, and recurrent seizures can all affect brain development and cognitive functioning. In this way, the memory difficulties I observed during my examination are consistent with the biological impact of these contributing factors on her cognition.

37. Given her cognitive impairment, it is my opinion that she would benefit from certain accommodations. These may include: holding the hearing in person to allow her to feel more supported by her legal team and by family or friends who can provide emotional and psychological support; prohibiting cross-examination or, if cross-examination is permitted, restricting hostile or misleading questions; allowing her to take breaks during the hearing if she experiences dissociation or emotional distress; and taking into account her history of cognitive impairment, PTSD, and epilepsy when assessing the credibility of her testimony.

38. Laura requires ongoing treatment for her PTSD, epilepsy, and cognitive impairment. She also has history of alcohol use disorder, with her using alcohol to self-medicate and treat her ongoing post-traumatic stress symptoms. Therefore, treatment of her alcohol use disorder should be in conjunction with her treatment of her mental health symptoms, to optimize her changes for recovery. Notably, adverse experiences in childhood greatly increase the risk of both mental illness and alcohol dependence later in life, in part due to neurobiological changes and emotional dysregulation that affect the pathophysiology of both mental illness and alcohol dependence.[7]

[3] Mohlenhoff BS, Chao LL, Buckley ST, Weiner MW, Neylan TC. Are hippocampal size differences in posttraumatic stress disorder mediated by sleep pathology? Alzheimer's & Dementia. 2014;10(3, Supplement):S146-S154. doi:10.1016/j.jalz.2014.04.016

[4] Ibid.,

[5] Brewin CR. The Nature and Significance of Memory Disturbance in Posttraumatic Stress Disorder. Annu Rev Clin Psychol. 2011;7(1):203-227. doi:10.1146/annurev-clinpsy-032210-104544

[6] Saadi A, Hampton K, Vassimon de Assis M, Mishori R, Habbach H, Haar R. Associations between memory loss and trauma in US asylum seekers: a retrospective review of medico-legal affidavits. *PLoS One.* 2021; 1693): e0247033.

[7] Brady KT, Back SE. Childhood trauma, posttraumatic stress disorder, and alcohol dependence. Alcohol Research 2012;34(4):408-13. PMID: 23584107; PMCID: PMC3860395.

That she acknowledged the connection between her prior trauma and her alcohol use is a positive indicator for recovery.

39. Laura's medical and mental health conditions likely contributed to her missing the one-year filing deadline for her asylum case. As stated above, her first year in the U.S. was marked by recurrent seizures, challenges in obtaining her seizure medications, adjustment to separation from her children, and ongoing physical and verbal abuse by her then-partner Jefferson. These can limit one's cognitive and emotional capacity, specifically by decreasing performance on executive function tasks which are crucial for tasks requiring planning, organization, and decision-making[8]. The improvement in her seizure control after separating from Jefferson, along with her ability to manage her life and submit her asylum application, reflects the positive impact of removing an abusive partner who had been worsening her physical and mental health.

40. Her PTSD significantly impacts emotional regulation, which can lead to intense mood swings, irritability, and difficulty managing emotional responses. This can lead to conflicts in relationships as she may have difficulty managing feelings of anger or irritability. I believe this may have contributed to her criminal history, including the altercation with Oscar Vivar-Ortega. When discussing this event with her, she expressed remorse and acknowledged that her time in detention—including group therapy and opportunities to reflect on her past behavior—has helped her to recognize there are healthier wages to manage acute stress and seek support, rather than feeling the need to act impulsively. We did not discuss her other criminal activity in the evaluation. However, as stated above (in paragraph 38), her alcohol use history should be understood in the context of her using alcohol to self-medicate and treat her ongoing post-traumatic stress symptoms.

41. In view of the information relayed above, it is my judgement that forcing Laura to return to Ecuador poses a serious threat to her physical and mental health, including worsening of her seizures and PTSD symptoms. Given her perception of threat—shaped by previous failed attempts to escape the threat in Ecuador, including inadequate police protection, and return to where her formerly abusive partner is currently—it is unlikely that relocating within the country would allow her to avoid these consequences.

42. I declare under penalty of perjury, pursuant to the laws of the United States, that the foregoing is true and correct to the best of my knowledge.

Altaf Saadi, MD MSc

---

[8] Arnsten AF. Stress signalling pathways that impair prefrontal cortex structure and function. Nat Rev Neurosci. 2009 Jun;10(6):410-22. doi: 10.1038/nrn2648. PMID: 19455173; PMCID: PMC2907136.