UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LAURA MARIA GUEVARA PERUANO,<br><br>Petitioner,<br><br>v.<br><br>DAVID WESLING et al.,<br><br>Respondents. | Civil No. 26-10300-LTS |

MEMORANDUM AND ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

May 20, 2026

SOROKIN, J.

Laura Maria Guevara Peruano, a citizen of Ecuador, instituted this action by filing a petition pursuant to 28 U.S.C. § 2241 challenging her detention by immigration authorities. Events that transpired in the wake of the petition's filing spawned a series of supplemental submissions by the parties, multiple Court orders, and a pair of evidentiary hearings. The Court will describe those events below and explain its reasons for allowing the petition and sanctioning U.S. Immigration and Customs Enforcement ("ICE"). In short, the petition is allowed because Peruano is not subject to mandatory detention under 8 U.S.C. § 1225 for reasons this Court and many others have explained in a host of prior rulings. Sanctions arise from ICE's repeated false and misleading statements to the Court about material facts, combined with ICE's disregard of its constitutional obligation to ensure Peruano's health and safety while she was in ICE custody.

I.   BACKGROUND

The following subsections identify certain overarching legal principles central to this case and then summarize the facts the Court finds are established by the record before it. Here, the

record includes specific allegations advanced in Peruano's petition, sworn statements by Peruano and a medical expert who evaluated her, documents offered by the parties as exhibits to various status reports and other memoranda, and sworn statements and testimony by representatives of ICE. With only one exception (concerning Peruano's medication during her final week in ICE's custody), the facts described in Peruano's submissions are not challenged by ICE.[1] The Court treats ICE's silence as a concession. The Court credits the sworn statements offered by Peruano as well as the testimony of two of ICE's in-house lawyers who appeared at an evidentiary hearing in this matter. However, as the Court will explain, other factual assertions and sworn statements by ICE are implausible—and sometimes demonstrably false—leading the Court to reject them.

A.    Legal Principles

Two general legal standards are helpful to understand before turning to the facts, as they provide lenses that will bring certain events into sharper focus.

First, "[w]hen the government 'so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses . . . the Due Process Clause.'" Savino v. Souza, 453 F. Supp. 3d 441, 450 (D. Mass. 2020) (quoting DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989)). As Justice Souter explained, the Constitution's due process guarantee obligates the government "to refrain at least from treating a [civil immigration] detainee with deliberate indifference to a substantial risk of serious

---

[1] Peruano has advanced factual allegations concerning the conditions of her confinement from the start of this case, including in her petition. Those allegations were later supported by two sworn declarations by Peruano and corroborated by other records and declarations filed as the case proceeded. Despite multiple opportunities to dispute or otherwise respond to her descriptions—via its own memoranda and sworn declarations, or during the several hearings and status conferences held in this case—ICE has largely remained silent.

harm to health." Coscia v. Town of Pembroke, 659 F.3d 37, 39 (1st Cir. 2011) (Souter, J.);

accord Savino, 453 F. Supp. 3d at 450–51. The government abdicates this constitutional

obligation if, despite having "an actual, subjective appreciation of [a] risk" of harm to a detainee,

it recklessly fails "to take the steps that would have easily prevented that harm." Leite v.

Bergeron, 911 F.3d 47, 52–53 (1st Cir. 2018). The facts recounted below cause the Court to

conclude that ICE was indifferent—deliberately so—to Peruano's basic human needs from

January 22 to January 31, 2026.

Second, a petitioner seeking to "challeng[e] their detention by immigration officials

pending a decision in immigration matters" may do so by filing a federal habeas petition

pursuant to 28 U.S.C. § 2241. Ozturk v. Trump, 777 F. Supp. 3d 26, 34 (D. Mass. 2025) (citing

Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec., 510 F.3d 1, 11 (1st

Cir. 2007)). Generally, such a petition must be filed in the district in which the petitioner is

"confined and must name as a respondent the petitioner's immediate custodian." Id. (citing

Rumsfeld v. Padilla, 542 U.S. 426, 442–47 (2004)). This is because a federal court issuing a writ

of habeas corpus acts "upon the person who holds [the petitioner] in what is alleged to be

unlawful custody." Vasquez v. Reno, 233 F.3d 688, 690–91 (1st Cir. 2000). Thus, the court

must have "personal jurisdiction over the person who holds the petitioner in custody" in order to

exercise jurisdiction over the petition. Id. (citing Braden v. 30th Jud. Cir. Ct., 410 U.S. 484, 495

(1973)).

As relevant here, these jurisdictional principles lead to a simple, threshold question:

Where was Peruano when she filed her petition? If she was in Massachusetts, then this Court

acquired jurisdiction at the time the petition was filed and retained it notwithstanding her

subsequent transfer to Louisiana.[2]  See Padilla, 542 U.S. at 441 (discussing Ex parte Endo, 323 U.S. 283 (1944)); accord Ozturk, 777 F. Supp. 3d at 36.  If she was in a different state, with her custody controlled by an individual in that state, jurisdiction would lie in the district court located there.  Though this question can have only one answer—and that answer should have been readily available to representatives of the government agency responsible for detaining and transporting Peruano—that did not prove to be the case here.  Instead, resolution of this question was clouded by a dispute that began with a false and misleading statement by ICE concerning the time Peruano's plane took off, which led to a series of further false and misleading statements.

   With those principles in mind, the Court turns to the facts it finds from the record the parties have adduced.  Its findings focus on those circumstances material to the two central and disputed issues this case has presented from the start: whether ICE was indifferent to Peruano's medical needs, and whether this Court had jurisdiction over her petition at the time of its filing. The Court begins with Peruano's background, her relevant medical conditions, and the manner in which ICE repeatedly disregarded its constitutional duty to ensure Peruano's health and safety during the last week she spent in ICE's custody.  Then, the Court describes how ICE's statements evolved concerning where Peruano was located at 12:29 PM on January 23, 2026, when her petition was filed.

---

[2] The first respondent named in Peruano's petition is David Wesling, the Field Office Director with authority over ICE's Burlington Field Office, which is responsible for ICE operations throughout New England.  If Peruano was still in Massachusetts when the petition was filed, then Wesling was a person within this District with authority over her custody.  See Van Tran v. Hyde, No. 25-cv-12546, 2025 WL 3171210, at *4 (D. Mass. Nov. 13, 2025) (explaining in similar circumstances why field office's acting director was appropriate respondent); cf. Cunha v. Freden, No. 25-3141-pr, 2026 WL 1146044, at *2 (2d Cir. Apr. 28, 2026) (slip op.) (affirming grant of habeas petition naming field office director as respondent).

B.    Peruano's Experiences

Peruano arrived in the United States in September 2022.  Doc. No. 1 ¶ 2.[3]  She is a human-trafficking victim, brought to this country by an abusive former partner "for the purpose of sex and labor trafficking."  Doc. No. 23 ¶ 2.  Border Patrol officers stopped her when she crossed into Texas, then paroled her into the United States, issuing a Notice to Appear that instituted removal proceedings before an Immigration Judge ("IJ").  Doc. No. 35 at 3.  She settled in Connecticut and applied for asylum and other forms of relief from removal.  Doc. No. 23 ¶ 3.  Her asylum application stems from abuse and mistreatment she suffered in Ecuador as a result of a serious medical condition: epilepsy.  Id.  She was frequently and violently physically abused by her parents, beaten and "subject[ed] to forced sexual intercourse" by two romantic partners, and forcibly sterilized by the Ecuadoran government.  Doc. No. 35-1 ¶ 3; Doc. No. 35-2 ¶¶ 10–16.

During her three years living in the United States, Peruano was not convicted of any crimes nor was she ever denied release by state authorities, see Doc. No. 19-7 ¶¶ 8–15; however, by August 2025 she faced pending charges arising from a driving-related matter and a separate domestic-assault arrest, id. ¶¶ 14–15; Doc. No. 1 ¶ 3.  Neither Peruano nor ICE submitted any further details about these charges.  No state-court judge detained Peruano; rather, she was released into the community while the criminal cases proceeded.  Two months after her arrest and release on the domestic-assault charge, ICE officers arrested Peruano.  Doc. No. 19-7 ¶¶ 15–

---

[3] Citations to "Doc. No. __ at __" reference items appearing on the Court's electronic docketing system ("ECF") using the document and page numbering that appears in the ECF header or, if appropriate, paragraph numbering appearing within the document itself.  Some documents in this case were filed under seal, such as Peruano's medical records and internal ICE documents containing identifying information about flight and other transport operations.  To the extent the Court has relied here on information contained in such documents, it has recounted facts repeated elsewhere in the public portions of the record and/or facts necessary to explain its decision without including non-public details that warrant continued sealing.

16. ICE then detained her without providing a bond hearing pending the resolution of her immigration proceedings.

In mid-January 2026, the IJ presiding over Peruano's removal proceedings granted her withholding of removal from Ecuador, finding that she would suffer persecution if she returned there. Doc. No. 23 ¶ 3. The IJ denied Peruano's application for asylum, though, and Peruano has a pending appeal challenging that portion of the IJ's decision.[4] Id. ¶ 4. By regulation, the pending appeal stayed her removal order. See 8 C.F.R. § 1003.6(a).

From her August 2025 arrest by ICE through her January 2026 removal proceedings, Peruano remained detained by ICE, housed at the Cumberland County Jail ("CCJ") in Portland, Maine. Doc. No. 23 ¶ 15. At no point during her time at CCJ did Peruano seek to challenge her detention in federal court. Things changed ten days after the IJ's ruling.

On January 22, 2026, ICE transferred Peruano out of CCJ without advance notice to Peruano or her immigration attorney. Doc. No. 1 ¶ 5. The transfer arose suddenly and was undertaken after 8:00 PM. Id.; Doc. No. 23 ¶ 19; Doc. No. 27-2; Doc. No. 35-1 ¶¶ 7–10. Peruano was driven from CCJ to the ICE Field Office in Burlington, Massachusetts, where she arrived shortly before 10:30 PM. Doc. No. 27-2.

In a sworn statement, ICE described the transfer as "part of standard ICE operations to advance the agency's mission and optimize bedspace management." Doc. No. 10 ¶ 13. The Court rejects this statement as incredible. ICE's own records created around the time of the transfer described it differently, labelling it with this notation: "EMERGENCY DECOMP CCJ." See Doc. No. 27-5 at 1. ICE's subsequent sworn statement failed to identify any "emergency,"

---

[4] Though the government reserved its right to appeal the IJ's decision to grant withholding of removal, Doc. No. 19-7 ¶ 17, the record does not reveal whether the government filed such an appeal before the deadline expired.

explain the "emergency" characterization in ICE's contemporaneously created records, or otherwise square a "standard" transfer with "emergency" records.  The Court's many years of experience suggest detention facilities and law-enforcement officers rarely commence prisoner movements at night, especially "standard" movements.  Here, there was no emergency at CCJ requiring the removal of prisoners, nor was there an emergency related to Peruano requiring her sudden transfer.

Moreover, Peruano was not the only person moved out of CCJ that night; she traveled on a van full of detainees to the Burlington Field Office.  Doc. No. 35-1 ¶¶ 6–11; Doc. No. 28-1. ICE concedes that the holding area in Burlington (unlike CCJ) is neither intended nor equipped to house one person, let alone a large group of people.  See Doc. No. 33 at 35–36 (testifying hold room is "not set up for long-term housing" and "do[es]n't really have beds").  Armed with this knowledge and in the absence of any emergency, ICE nonetheless kept dozens of women in the holding room overnight on January 22.  Doc. No. 35-1 ¶ 12.

Given all this, the Court rejects ICE's claim that the move was a garden-variety transfer to manage detention space and also rejects the assertion it was conducted in the ordinary course.[5] Those positions are incredible and implausible.  Removing Peruano from CCJ at the time and in the manner ICE did—and then failing to candidly explain this action to the Court—marks ICE's first departure from the standards governing the conduct of a government agency responsible for the health and safety of persons it has chosen to detain.[6]  And the two different characterizations

---

[5] Contemporaneous news reports provide a different explanation—that ICE removed dozens, if not all, of its detainees from CCJ only hours after the sheriff responsible for that facility exercised his First Amendment rights by publicly criticizing certain ICE actions.  See Sawyer Loftus, ICE removes detainees from Portland jail after sheriff criticizes agents, Bangor Daily News (Jan. 24, 2026), 2026 WLNR 2385935.

[6] ICE is free to move prisoners, including at night; however, ICE is not free at any time of day to ignore the obligations imposed on it by the Constitution regarding the care of persons in ICE's

in the record concerning the reasons for Peruano's transfer are ICE's first false and misleading statements of fact in connection with this case.

At the time ICE undertook this transfer, it had actual knowledge that Peruano suffered from a serious medical condition. As noted, it was the focus of her asylum claim. During her five months at CCJ, Peruano received consistent medical care including medication prescribed to treat her epilepsy, which she received daily. Doc. No. 23 ¶ 16. This helped, but her symptoms did not fully abate. Id. To further mitigate the risks Peruano faced from her seizures, CCJ staff assigned Peruano a bottom bunk and notified ICE of the need for this accommodation. Id. ¶ 18. When ICE chose to remove Peruano from CCJ—suddenly, without notice, and at night—staff at CCJ provided ICE transport officers with a temporary supply of Peruano's epilepsy medication and a medical transport form that identified her diagnosis and included instructions for dispensing her medication. Doc. No. 19-6 at 31, 49. CCJ's actions were consistent with the standards governing the conduct of a government agency responsible for the health and safety of persons in its custody, and they satisfy the obligations imposed on such an agency by the United States Constitution. Cf. U.S. Dep't of Just., U.S. Marshals Serv., Justice Prisoner & Alien Transportation System Cabin Crew Policy & Procedures Manual § 15.2 (updated Jan. 8, 2021), https://www.governmentattic.org/55docs/ USMSccmfpt2021.pdf [https://perma.cc/MX9K-X6S] (describing procedures of U.S. Marshals Service for transporting detainees requiring prescription medication).

When Peruano arrived at the ICE facility in Burlington, she found conditions very different than CCJ. She was crowded into a holding room with many other women. Doc. No.

---

custody. Transferring a large number of detainees at night—without advance warning, without notice to their lawyers, and in the absence of an emergency—from a facility suitable for housing such a group overnight to one that is not, falls short of those constitutional obligations.

35-1 ¶ 12.  The room lacked beds or even benches for every person.  Id.  It was hot, stuffy, full of people in distress, and "brightly lit all night."  Id. ¶¶ 13, 17.  Only one toilet was available for all of the women to share; it was visible to everyone in the room and "smelled terrible."  Id. ¶¶ 14, 17.  While in this room, Peruano had a seizure that required medical intervention.  Id. ¶ 15; see also id. ¶ 16 (alleging other women in the same room that night fainted, with some "sent to the emergency room").  The conditions in which ICE kept Peruano on the night of January 22 were another departure from the standards governing the conduct of a government agency responsible for the health and safety of a person it has chosen to detain.

On the morning of January 23, Peruano was shackled, placed in a vehicle with other detainees, and driven to Hanscom Airfield in Bedford, Massachusetts.  Doc. No. 35-1 ¶ 18; Doc. No. 27-1 at 3.  This transfer, like the move the night before, occurred without notice to Peruano's lawyer.  Doc. No. 35-1 ¶ 18.  ICE failed to feed Peruano during the transfer, which spanned something on the order of twelve hours.  It provided her no breakfast that morning at Burlington, no food while waiting for hours at Hanscom, and no meals during the four-hour plane ride to Louisiana.  Id. ¶¶ 18–22.  Nor was she provided access to a bathroom before or during this all-day journey.  Id.  Once again, Peruano did not experience this transfer, in these conditions, alone.  Id. ¶ 18.  The conditions to which ICE subjected Peruano and the others being transferred with her on January 23 marked another departure from the standards governing the conduct of a government agency responsible for the health and safety of persons it has chosen to detain.

On top of all this, ICE did not provide Peruano epilepsy medication while at Burlington or in transit from Burlington to Louisiana.  See Doc. No. 1 ¶ 11; Doc. No. 23 ¶ 23.  Of course, ICE knew Peruano suffered from epilepsy, knew she required medication for it, knew CCJ had provided the necessary medication to transport officers when ICE removed Peruano from CCJ,

and knew Peruano suffered a severe seizure during the night at Burlington.  This was another departure from the standards governing the conduct of a government agency responsible for the health and safety of a person it has chosen to detain.

While Peruano was still in Massachusetts, just after noon on Friday, January 23, her lawyers filed a habeas petition in federal court.[7]  Doc. No. 1.  The petition alleged Peruano was detained in violation of law and that ICE was endangering her life by failing to provide her with medication and care necessary to treat her epilepsy.  See id. ¶¶ 10–11.  In particular, the petition advanced the following claims: a Fifth Amendment violation due to allegedly inhumane conditions of confinement at the Burlington Field Office, and violations of 8 U.S.C. § 1226(a) and the Fifth Amendment's due process guarantee arising from the failure to provide Peruano a bond hearing.  Id. ¶¶ 41–66.  As relief, Peruano sought immediate release or, in the alternative, a prompt bond hearing, as well as an award of attorney fees pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412.  Doc. No. 1 at 14–15.

In response to this petition, the Court first issued a standard order directing service on ICE and the other respondents, setting an answer deadline, and prohibiting ICE (on an interim

---

[7] Petitions by noncitizens challenging their detention by ICE have become standard fare in federal courts around the country in the wake of July 2025 guidance issued by ICE changing the approach to detention it had applied for nearly thirty years, impacting "by all accounts, millions of men, women, and children" living in this country.  See Cunha, 2026 WL 1146044, at *2.  As far as this Court is aware, all District Judges in Massachusetts have deemed ICE's new policy unlawful.  See Guerrero Orellana v. Moniz, 802 F. Supp. 3d 297, 307 (D. Mass. 2025) (collecting cases from this District and nationwide).  Because of that, petitions filed in this District raising challenges to detention under that policy typically lead to a prompt and abbreviated response from the government preserving its position but conceding that the analysis previously endorsed by this Court in similar cases would apply equally to the next one.  That analysis has often yielded an order granting the petition and requiring the petitioner's release unless a bond hearing is held within seven days, at which the government would bear the burden of proving detention is necessary due to a risk of flight or danger.  See Hernandez-Lara v. Lyons, 10 F.4th 19, 41 (1st Cir. 2021).

basis only, pending an assessment of the Court's jurisdiction at least) from removing Peruano from Massachusetts or from the United States.  Doc. No. 4.  Because the allegations in the petition regarding Peruano's epilepsy were not standard—in fact, they were emphasized in bold throughout the petition—the Court promptly issued a second directive.  "Pending resolution of this matter," the Court ordered ICE to "ensure that [Peruano] is provided with appropriate medical care," and specifically prohibited ICE from denying her "epilepsy medication in the absence of an evaluation by a licensed medical practitioner."  Doc. No. 5.

The Court issued the standard order and the separate directive concerning medication on January 23 moments before 1:30 PM.  Peruano was waiting at Hanscom Airfield when the Court's orders issued.  See Doc. No. 19-2 at 1–2; Doc. No. 19-3 at 5–6.  ICE's counsel—the United States Attorney's Office ("USAO")—received notice of both orders within a few minutes of their docketing, and a paralegal emailed the orders to ICE at 2:08 PM.  Doc. No. 15 at 2; Doc. No. 19-4.  The Court's second order emphasized to ICE an important fact with a direct impact on ICE's constitutional obligations to Peruano: her medical condition.  When the USAO sent notice of the Court's orders to ICE, Peruano was still at Hanscom.  Doc. No. 19-3 at 5–6.  Though the Court did not know it then, ICE already knew about Peruano's medical condition and was already deliberately disregarding it.  Shortly after the email to ICE, Peruano's flight departed Hanscom for Louisiana.  ICE's disregard traveled with her.

Peruano arrived late that night at the South Louisiana ICE Processing Center.  Doc. No. 35-1 ¶ 23; see Doc. No. 19-3 at 5 (reflecting plane touched down in Louisiana after 6:00 PM); Doc. No. 19-6 at 1, 4–7 (documenting lab testing presumably done during intake process at facility with timestamps of 11:30 PM on January 23 and 2:33 AM on January 24).  There, she saw detainees "sleeping on the ground," intermittent running water that appeared "brown," and

broken or overflowing communal toilets.  Doc. No. 35-1 ¶¶ 23–25.  Peruano received no epilepsy medication upon her arrival, nor on Saturday, Sunday, or Monday.  Doc. No. 23 ¶¶ 23–26.  She suffered multiple seizures during that time, as many as five or six in one day.  Id. ¶ 24.  Peruano requested, but was denied, a bottom bunk despite explaining that CCJ had provided such an accommodation and deemed it necessary due to her epilepsy.  Id. ¶¶ 27, 29; see Doc. No. 40-1 at 3.  ICE also ceased providing her additional medications prescribed to her by doctors at CCJ to treat anxiety and depression; staff in Louisiana informed her that such medication was not available at that facility.  Doc. No. 23 ¶ 26.  The circumstances Peruano encountered in Louisiana in ICE's custody form another departure from the standards governing the conduct of a government agency responsible for the health and safety of persons it has chosen to detain.

On Tuesday, January 27, ICE responded to Peruano's petition with a memorandum seeking its dismissal on grounds the Court will address in a moment.[8]  Doc. No. 9.  Because ICE's response failed to say anything about whether Peruano needed or was receiving epilepsy medication, the Court convened a video status conference on the afternoon of January 27 with counsel for the parties.  During that conference, the Court learned that ICE had failed to respond to its lawyers' inquiries concerning the status of Peruano's medication.  Peruano's lawyer advised that Peruano still was not receiving medication; ICE's lawyers promised to investigate.

That night, ICE reported to the Court that Peruano was receiving "any and all medications prescribed."  Doc. No. 12.  This was another false and misleading statement of fact made by ICE in connection with this case.  Peruano attests that she received a single dose of medication, which she assumed to be for epilepsy, on January 27 and again on January 28.  Doc.

---

[8] On January 26, all in-person proceedings before the Court were cancelled due to a snowstorm. In light of that fact, the Court accepted the filing made by the respondents on January 27 though it was a day late.

No. 23 ¶¶ 26, 28.  She received only one dose on those days despite being prescribed two doses daily, she received no other medications on those days, and she received no medication at all any of the other days she spent detained in Louisiana.  Id. ¶¶ 30–31.  In Peruano's words, stated "under penalty of perjury": "Every time [medication] was offered to me, I took it.  My seizures are horrible and I would never refuse to take medication."  Doc. No. 35-1 ¶ 23.  The Court credits Peruano's statements regarding her medication.

Though her medical records contain multiple forms purporting to document instances when Peruano refused medication, Doc. No. 40-2 at 11–16, 26–29—and though an ICE-contracted doctor has echoed the supposed refusals noted on those forms, Doc. No. 40-1 at 2— the same records show that the encounters producing the so-called refusals were undertaken in English, without an interpreter, Doc. No. 40-2 at 11, 13, 15, 26, 28.  Peruano is not a native English speaker.  ICE, of course, knew this.  See Doc. No. 40-2 at 19, 23, 31, 40 (identifying "Spanish" as Peruano's "primary language," noting she is unable to "read and write English," and flagging need for Spanish interpreter).  Records of encounters that occurred with a Spanish translator reflect Peruano's fulsome cooperation with staff and bear her signature.  See id. at 17– 23, 25, 30–38, 41–43.  Records of encounters that occurred in English and bear signatures of English-speaking witnesses but not Peruano are not proof that she refused medication.  Such records amount to another false and misleading statement of fact made by ICE in connection with this case, and they evidence another departure from the standards governing the conduct of a government agency responsible for the health and safety of persons it has chosen to detain.  By failing to provide a necessary interpreter when dispensing prescription medications to Peruano, then blaming Peruano for refusing medication rather than acknowledging and accepting responsibility for this failure (which is apparent on the face of the medical records ICE's medical

13

reviewer claims to have read), ICE was deliberately indifferent to its constitutional obligations concerning Peruano's health and safety.

On January 30, ICE reiterated to the Court that Peruano was "currently receiving all prescribed medications." Doc. No. 13 at 1. This was another false and misleading statement of fact made by ICE. Again, the record establishes that, after ICE removed her from CCJ and until this point, Peruano had not received either of two prescribed mental-health medications she was receiving at CCJ, see Doc. No. 13 at 2; Doc. No. 13-2; and she was not receiving her epilepsy medication consistent with the prescribed schedule (i.e., twice daily), see Doc. No. 8. In addition, since her arrival in Louisiana, ICE had refused to assign Peruano a bottom bunk; her requests in this regard fell on deaf ears. Doc. No. 23 ¶¶ 27, 29. ICE concedes it failed to provide Peruano this accommodation, attributing the failure to a previously undisclosed "clerical error." Doc. No. 40-1 at 3. The Court rejects this explanation—and the accompanying claim that the "error" would have been remedied promptly, had Peruano remained in ICE custody in Louisiana, id.—as implausible. Offered by the same declarant who accused Peruano (falsely) of having refused medication, ICE's claim of error was another false and misleading statement of fact in this case. ICE knew Peruano's medical condition required a bottom bunk—indeed, she was provided one at CCJ, medical staff there had notified ICE of this necessary accommodation, and Peruano raised it herself upon arriving in Louisiana. ICE nevertheless refused to provide her one, thereby demonstrating deliberate indifference to her health and safety in violation of the United States Constitution. Nothing before the Court remotely suggests that ICE would have reversed course and provided Peruano the necessary accommodation.

As a result of ICE's apparent deliberate indifference to Peruano's serious medical condition, on Friday, January 30, the Court required ICE to bring Peruano back to Massachusetts

14

and release her temporarily pending resolution of the habeas petition, and to also "preserve all records" concerning Peruano's "care, custody, detention, housing, treatment, [and] transportation . . . from January 22, 2026 until the time of her release." Doc. No. 14. The Court gave ICE until the following Monday to return Peruano from Louisiana. Id. Though ICE complied with the letter of the Court's directive, see Doc. No. 16, they did so by dropping Peruano off at an airport in Louisiana on January 31 in a "beige prison uniform," without "the identification documents" or the clothing she possessed when she was first arrested. Doc. No. 35-1 ¶ 26. ICE left her at the airport with tickets for a series of connecting commercial flights to Boston, and "a bag of stuff" she later realized contained "some pills." Id.; Doc. No. 23 ¶¶ 34–35.

By the Court's count, the foregoing describes at least half a dozen ways in which ICE disregarded the standards the Constitution demands of a government agency responsible for the health and safety of a person it has chosen to detain. Considered altogether, this course of conduct demonstrates ICE's deliberate indifference to Peruano's health and safety, both generally and specifically as a result of her known and serious medical condition. ICE's failure to comply with the constitutional obligations it assumed when it took Peruano into custody bears on the appropriate scope of relief and also warrants sanctions, as the Court will explain below. But first, additional background is necessary to understand how a dispute about this Court's jurisdiction unfolded.

C.    Jurisdictional Inquiry

When the Court released Peruano, it did so only temporarily, pending the disposition of her federal habeas petition. Doc. No. 14. An important legal issue remained unresolved: did the Court have jurisdiction over this habeas petition? Here, the departure time for the ICE plane carrying Peruano out of Massachusetts likely determined the answer to the question. If the plane took off at 11:20 AM on January 23, as ICE claimed throughout the first week this action was

15

pending, see Doc. No. 13 at 1, then this Court's jurisdiction was subject to challenge.[9]  But if the plane left after 2 PM, as Peruano urged, id. at 3, then the Court unquestionably had jurisdiction.

As noted above, notice of Peruano's petition and the Court's initial orders was provided to the USAO just after 1:30 PM on January 23, and forwarded by the USAO to ICE at 2:08 PM that day.  Doc. No. 19-4.  Along with the forwarded notice, the USAO asked ICE to confirm Peruano's location.  Id.  ICE responded to the USAO's email at 2:20 PM on January 23.  Id.  The email response informed the USAO that Peruano was in Burlington.  Id.  She was not.  By that time, Peruano was on an ICE airplane that had taken off from Hanscom Airfield eight minutes earlier, at 2:12 PM.  Doc. No. 19-3 at 5–6.  In fact, she had left Burlington in an ICE transport vehicle at 10:30 AM, four hours before ICE's email telling its lawyers she was still at the Field Office.  See Doc. No. 27-1 at 3.  ICE's email reporting Peruano's location to its own lawyers was false and misleading, and it concerned a fact upon which the lawyers would rely in determining how to respond to, and defend against, the petition on ICE's behalf.

When ICE did respond to the petition on January 27, it urged that the Court lacked jurisdiction over the action and should dismiss it.  Doc. No. 9.  For this argument to prevail, ICE had to establish as true one foundational fact: that Peruano left Massachusetts and was located elsewhere by 12:29 PM on January 23, when her federal petition was filed.  To that end, ICE submitted an under-oath statement from Supervisory Detention and Deportation Officer ("SDDO") Brian Sullivan, a sworn law-enforcement officer with more than fifteen years of

---

[9] Despite ICE's adherence to its position about the flight's departure time, on January 30 the respondents suggested they would agree "that this Court may retain jurisdiction over this matter."  Doc. No. 13 at 1.  They did not square this position with their earlier argument that the Court "never acquired jurisdiction" in the first place, Doc. No. 9 at 12, nor did they cite any legal authority allowing the respondents to confer subject-matter jurisdiction where it would otherwise be lacking.

experience.[10]  Doc. No. 10; Doc. No. 33 at 22.  Sullivan said Peruano "departed the Laurence F. Hanscom Field Airport in Bedford, Massachusetts on a flight at approximately 11:20 a.m. EST enroute to the Alexandria International Airport in Rapides Parish, Louisiana, where she arrived at approximately 3:00 p.m. EST."  Doc. No. 10 ¶ 12.  This turned out to be another false and misleading statement of fact made by ICE in connection with this case.[11]

Sullivan attributed his misstatement to a combination of 1) his inexperience with declarations regarding flight timing, 2) the limited resources available to him in his SDDO role, and 3) restrictions limiting access to information concerning ICE-contracted aircraft.  None of these factors plausibly justify his misstatement in this case.  As noted, Sullivan is a long-serving law-enforcement officer with considerable experience preparing under-oath submissions to federal courts.  See supra, note 10.  He understood that information was available to him on "a need-to-know basis," that his SDDO duties did not typically require him "to know about air

---

[10] In addition to being an employee and representative of the United States government, a sworn law-enforcement officer like Sullivan is a person authorized under federal law to carry firearms, make arrests, and investigate federal crimes.  See 34 U.S.C. § 50301(5); 18 U.S.C. § 115(c)(1). Such persons take an oath to uphold the laws of the United States and are also authorized to submit affidavits to United States District and Magistrate Judges in support of government requests for search or arrest warrants.  See Fed. R. Crim. P. 41(a)(2)(C), (d).  These statutes and rules vest a federal law-enforcement officer with substantial authority and responsibility.  And Sullivan understands this.  He has written "multiple" affidavits "under the pains and penalties of perjury" for submission to federal judges in criminal cases and is aware that judges review and rely on such documents when "making significant decisions."  Doc. No. 33 at 22–25.

[11] Sullivan's declaration did not mention the fact that a different ICE representative had informed the USAO on January 23 hours after 11:20 AM that Peruano was still in Burlington, Doc. No. 19-4, let alone reconcile that statement with Sullivan's description of Peruano's departure time. Sullivan later explained that a detainee's location generally is not updated in ICE's primary electronic records system until after a flight "goes wheels up" and transporting officers return to their office.  Doc. No. 33 at 19–21.  Because of this—and because detainees typically are not held long in Burlington—Sullivan testified that paper and electronic logs maintained by the Field Office to document arrivals and departures of detainees should be consulted by any ICE representative before confirming a detainee's location.  Id. at 26–29, 32–33, 36.  In short, Sullivan knew how to determine the location of a person but, as will become clear, did not take the necessary steps.

17

ops," and that the entire purpose of his declaration in this case was to inform the Court of Peruano's departure time. Doc. No. 33 at 7. Still, Sullivan did not ask for help, he did not check the logs he knew were maintained by the Field Office, and he did not seek access to any additional resources concerning ICE flight information. Id. at 17–18. Instead, he read the draft declaration supplied to him by an ICE lawyer,[12] checked an internal web resource entitled "ICE Air Operations Schedule" that listed one flight scheduled on January 23, and looked at a flight manifest to confirm that Peruano was listed as a passenger on that flight. Id. at 8–12; Doc. No. 19-1 at 2. Sullivan then assumed that the flight had departed on time and did nothing to confirm whether that assumption was correct. He signed and returned the declaration to ICE's lawyers, conveying to them that he had verified the information it contained. Doc. No. 30 at 40.

A law-enforcement officer can draw reasonable inferences from available facts in the course of their work, including when making sworn statements like the declaration submitted here. But Sullivan did not draw such an inference. He made an unfounded guess about a crucial and ascertainable fact—a fact upon which ICE's lawyers relied in asking this Court to dismiss Peruano's petition. Sullivan concededly had no personal knowledge about the timing of the relevant flight, or about how often ICE flights more generally experience delays or schedule adjustments.[13] Doc. No. 33 at 21, 40–41. He sought no input or guidance from anyone else at

---

[12] The USAO is akin to ICE's outside counsel; lawyers working at ICE's Office of the Principal Legal Advisor, or "OPLA," are akin to ICE's in-house counsel. OPLA lawyers typically collect necessary information from ICE; then use that information to prepare drafts of declarations for cases like this one; then return the drafts to ICE officers for review, verification, revision, and signature by an appropriate reviewing ICE representative. See Doc. No. 30 at 35–40.

[13] Sullivan defended his assumption by citing a few experiences "years ago" when he recalled that a delayed or cancelled flight might have been marked in yellow or red on ICE's scheduling resource. Doc. No. 33 at 10–12, 21, 40–41. The Court rejects that justification. Even accepting that ICE ever documented flight delays or cancellations in this way, Sullivan conceded he later learned from an Assistant Field Office Director ("AFOD") that the scheduling resource was not reliably updated. Id. at 14. No reasonably diligent law-enforcement officer would swear to a

ICE who did have such knowledge (for example, an officer working directly with ICE's air operations).  Rather, he simply supposed that the plane had probably departed as scheduled after he "thought [he had] exhausted all remedies."[14]  Id. at 13.  Of course, the whole point of Sullivan's declaration was to inform the Court what time Peruano left Massachusetts.  The time her flight actually took off (not the time it was scheduled to do so) was the only material fact Sullivan was asked to verify and report under oath.  Yet, he relied on a resource ICE itself denominated a "schedule" without making any effort to find out whether the flight had left on time.  All of this signals a careless and indifferent approach to a sworn declaration, submitted to a federal court on behalf of ICE, concerning a pivotal, jurisdictional fact.

During the January 27 status conference in this case, Peruano's lawyer challenged the claim that Peurano's flight took off at 11:30 a.m.  Counsel said she had information suggesting that, contrary to the timing described in Sullivan's declaration, Peruano's plane had not left until after 2:00 PM on January 23, well after the habeas petition was filed.  The Court told the parties to confer and report back in a few days.  It did not then probe the issue further, on the presumption that the departure time for a particular flight on a particular day is ordinarily a discrete and easily knowable fact as to which a genuine dispute seemed unlikely.

---

material fact on the basis of an assumption derived from stale and isolated experiences, without seeking further confirmation or at least disclosing the basis of the "assumption" in the sworn document, especially while withholding from the federal court the tenuous basis for his assumption.

[14] Sullivan also testified under oath that he searched for the relevant flight using a public website ("flighttracker.com"), but his search had yielded no results because the tail number for the relevant aircraft was "blocked."  Doc. No. 33 at 13, 22.  However, the Court's attempt to replicate Sullivan's supposed search of "flighttracker.com" suggests no such website exists.  That URL redirects to an error message on a website affiliated with Orbitz.  The top Google search result for both "flight tracker" and "flighttracker.com" appears to be the FlightAware website (a resource Sullivan claimed was not familiar to him).  The Court therefore finds that Sullivan made no such effort to confirm Peruano's flight time, and his testimony on this point is another false and misleading statement by ICE.

By the time the Court ordered her interim release three days later, on January 30, Peruano had identified to ICE and filed with the Court information supporting her belief that ICE was wrong about the plane's departure time.  Doc. No. 13-3 at 3.  Data from an online flight tracker called FlightAware showed that the only flight from Hanscom to Alexandria, Louisiana, on January 23 had taken off at 2:12 PM.  Id.  This data aligned with Peruano's recollection of events on the day of her transfer.  Doc. No. 13 at 3.  ICE, however, adhered to Sullivan's declaration and maintained that Peruano had left hours earlier.  Id. at 1; see Doc. No. 30 at 46–47.  Given that an agency of the United States had contended, supported by the sworn statement of a federal law-enforcement officer, that this Court lacked jurisdiction based on facts that Peruano contested with independent and facially credible evidence, the Court directed ICE to submit additional documents and scheduled a further hearing to resolve this factual dispute on which jurisdiction hinged.  See Doc. No. 15 at 1–3.

On February 6, ICE filed a second sworn declaration from Sullivan admitting his first under-oath statement concerning Peruano's departure time had been wrong.[15]  Doc. No. 19-7 ¶¶ 20–23.  Peruano's flight had, in fact, departed at the exact time identified by Peruano and confirmed by the FlightAware data: January 23 at 2:12 PM.  Id. ¶ 23.  Peruano, everyone now agreed, was in Massachusetts at the time her petition was filed.  ICE had moved her out of Massachusetts only after the petition was filed, after the Court's stay-of-transfer order issued, and after ICE's counsel had communicated that order to ICE.[16]  See Doc. No. 19-4.

---

[15] Sullivan had recently been promoted to the position of Acting AFOD.  Doc. No. 19-7 ¶ 1.  In this new position, Sullivan was responsible for overseeing the unit within the Field Office tasked with helping ICE's lawyers respond to any "pending federal litigation" and "ensur[ing] [ICE's] compliance with court orders."  Doc. No. 33 at 5, 26.

[16] The Court does not find that this amounted to knowing contempt of its stay-of-transfer order, as the record reflects that ICE's acknowledgement of having received notice of that order was sent to the USAO several minutes after the flight took off.  Doc. No. 19-4.  Peruano (sensibly)

20

In his second declaration, Sullivan also stated that "information regarding ICE-contracted flights" was "kept confidential" and was "unavailable on any public[] website, such as FlightAware." Doc. No. 19-7 ¶ 19. Of course, Peruano's counsel found data for the relevant ICE flight on FlightAware, where it was available to any member of the public without requiring any membership or payment of any kind. She even filed with the Court a FlightAware printout listing every flight departing from Hanscom on January 23, including the sole ICE flight. Doc. No. 13-3. Sullivan's sworn statement to the contrary is another false and misleading statement of fact in this case. He attributed this "wrong" statement to the OPLA lawyer who assisted in drafting the declaration, but his attempt to shift the blame is not credible. Doc. No. 33 at 51–53, 56 (claiming OPLA attorney "drafted the sentence" and Sullivan "just reviewed it," and that he did not know why it was included). The lawyer drafted the paragraph using information Sullivan provided to her. Doc. No. 30 at 58–63. Sullivan insisted Peruano's flight could not have appeared on FlightAware, despite the exhibit showing otherwise, because ICE flight information is "law enforcement sensitive." Id. On that basis, and after a second ICE officer echoed Sullivan's claim, the lawyer transmitted Sullivan's signed and sworn (and false) statement to the USAO for submission to the Court. Sullivan is therefore responsible for yet another false statement submitted to the Court in this case—this one made in the face of evidence plainly and directly contradicting it.

After the record was fully developed on the question of the Court's jurisdiction, the parties filed supplemental briefs addressing the merits of Peruano's claims. Doc. Nos. 35, 40. The respondents urged the Court to dismiss the petition without taking any further action. Doc.

---

has not argued that ICE knew about the order before the flight left and disregarded it by transferring her anyway. Even if she had so argued, the record does not support such a finding.

No. 40 at 1.  They described no measures undertaken by ICE in response to the events that occurred, and the institutional mistakes that were made, in this case.

## II.    DISCUSSION

The Court now turns to the merits of Peruano's claims, explaining why her petition is allowed and what relief is warranted in light of the foregoing findings of fact.  It then addresses why the facts warrant sanctions against ICE for its conduct in this case.

### A.    Merits

Peruano's habeas claims are legally straightforward.  Because it is beyond dispute that she was waiting at Hanscom Airfield in Massachusetts when counsel filed her petition, this Court has jurisdiction.  The respondents no longer contend otherwise, nor could they under any reasonable interpretation of the law or facts.

On the merits, the respondents have from the outset taken the position that, were the Court to adjudicate Peruano's petition, "the legal issues" it presents "are similar to those recently addressed by this Court" in various other cases, making further briefing unnecessary.  Doc. No. 9 at 12–13.  Based on that concession, and on the record before the Court, Peruano is not subject to mandatory detention pursuant to 8 U.S.C. § 1225.  Indeed, at no time during the five months she was detained at CCJ without a bond hearing was she subject to mandatory detention under that statute.  Her petition is therefore ALLOWED for the reasons expressed by this Court in the cases the respondents identified.  Doc. No. 9 at 12.

The question of relief remains.  The Court already ordered Peruano's temporary release while the case was pending.  Nothing the respondents have submitted states or implies that, in the months since her release, Peruano has in any way demonstrated that she poses a risk of flight or a danger to the community.  Nor have the respondents advanced any request or argument suggesting that any conditions of release are necessary going forward to protect against such risk

22

or danger or to ensure Peruano's appearance for future immigration proceedings.  Furthermore, the Court finds that the respondents' treatment of Peruano from January 22 to January 31, 2026, was infused with deliberate indifference.  See Doc. No. 35 at 5–9 (arguing ICE's treatment of Peruano amounted to substantive due process violation and warranted finding that release should continue without allowing respondents to seek bond hearing).  The unique constellation of facts presented here lead the Court to conclude that the following relief is appropriate:

1) Peruano's interim release pending resolution of her claims is hereby made permanent.

2) The respondents shall not retaliate against Peruano for the filing of this habeas petition or for any of her declarations or submissions in connection herewith.

3) The respondents shall not re-detain Peruano by invoking § 1225.

4) The respondents shall not detain Peruano in the future pursuant to § 1226(a) without: a) an individual and articulable change in circumstance that is material to assessing the risk of flight or danger to the community they believe she poses, and b) prompt notice to Peruano and her immigration lawyer concerning the reason(s) for detention, if the respondents re-detain Peruano consistent with this Order.

5) If ICE has not already done so, it shall within seven days of this Order make arrangements with Peruano's counsel for the return of Peruano's clothing, identification documents, and any other property seized from her at the time of her arrest.

The petition so resolved, the Court next explains why it finds additional consequences are warranted for ICE's course of conduct in this case.

B.    Sanctions

The Court made the following observation when the parties appeared before it for an evidentiary hearing:

23

> It certainly would seem that when ICE is flying human beings out of Hanscom Air Force Base that [ICE] ought to be able to know when the plane took off more easily than a lawyer at a nonprofit who simply did a simple Google search. You would think ICE would be able to find [the departure time] at least as quickly as petitioner's counsel and in an accurate way since it is [ICE's] plane . . . .

Doc. No. 41 at 22. But that proved not to be the case here. The record before the Court shows that ICE's failure to know, and to accurately report, the location of its own detainee arose from a combination of one ICE representative's carelessness and larger, systemic issues on the part of ICE (or, at least, the Burlington Field Office).

The record establishes that, "for a certain period of time, every time someone is transferred, their location in [ICE's] database is not correct." Doc. No. 33 at 20–21. In other words, ICE's system does not reliably contain accurate location information for persons in ICE's custody, leaving the agency itself unable to produce accurate information to its own lawyers, to AUSAs responding to matters pending in federal court, or to lawyers representing detainees in ongoing federal, state, or immigration court proceedings. In this case, ICE's primary database inaccurately reported Peruano's location for at least four hours on January 23, from 10:30 AM (when she left Burlington) until at least 2:30 PM (when ICE's transport team returned from Hanscom). Doc. No. 27-3 at 1.

During that period, important events unfolded: Peruano's lawyer filed her habeas petition, and an ICE officer wrongly reported to the USAO that Peruano was in Burlington. Accurate information about a detainee's location is vital to those responding on ICE's behalf to legal challenges where a person's liberty is at stake. It is crucial to determining which court has jurisdiction to entertain such challenges. It also matters for other institutional purposes not related to litigation, such as determining whether any individuals remain in a facility during an emergency, such as a fire, and require rescue. More generally, ICE's ability to know and report

24

where its own detainees are located at any given time is a fundamental obligation it owes by virtue of its decision to arrest and keep human beings in custody.

Sullivan confessed during a February 10 proceeding that, besides explaining his own mistake, he had taken no further steps to investigate the events that had unfolded in this case or to ensure similar errors did not occur again. Doc. No. 33 at 33–34, 38. This, despite his supervisory role at the Field Office, his awareness that ICE's lawyers had relied on and repeated to the Court multiple inaccurate statements of fact, his understanding that the errors concerned facts upon which this Court's jurisdiction depended, and the passage of (at least) several days since the errors had been made plain to him. Indeed, it was apparent that, before the hearing, it had not even occurred to Sullivan to take any further action to address what had happened in this case. See id. at 38.

In addition, neither OPLA lawyer involved in this matter was aware of any steps taken by their supervisors to address their office's procedures after learning of the inaccurate statements concerning flight time that ICE made to the Court in this case or the separate inaccurate statement concerning Peruano's location that one ICE representative made to the USAO. Doc. No. 30 at 48–40, 70–72. Each lawyer, individually and credibly, conveyed sincere dismay and expressed how the foregoing events had impacted her own approach to her work. Id. Those responses are laudable. But they are not enough. The absence of any broader, systemic response suggests continuing indifference by ICE and those overseeing the entity that essentially operates as its in-house counsel. And none of the respondents' submissions, before or after the evidentiary hearings, suggested such efforts were underway.

Granting Peruano's petition and awarding the relief described above does not, in this case, suffice. The Court finds that ICE has presented multiple false statements to the Court—

from its earliest submission in this case to its latest—and has failed to fully comply with the

Court's orders concerning Peruano's medication or fulfill its constitutional obligations to ensure

her health and safety while in ICE custody.  Accordingly, the Court finds that two types of

sanctions are warranted.

First, within seven days of this Order, the respondents shall file a notice on the docket

stating that copies of this Memorandum and Order have been provided to the following persons:

1) Sullivan; 2) Field Office Director David Wesling; and 3) the supervisor of the federal

litigation unit at OPLA.  As to Sullivan, the notice shall also state that the contents of this

Memorandum and Order, insofar as they address his conduct, statements, and testimony, have

been explained to him by counsel.

Second, Peruano requested in her petition, and is likely entitled to, a fee award under the

EAJA.  An exception to the general rule that "each party is . . . required to bear its own

attorneys' fees," Castañeda-Castillo v. Holder, 723 F.3d 48, 56 (1st Cir. 2013), the EAJA

provides:

> [A] court shall award to a prevailing party . . . fees and other expenses . . . incurred
> by that party in any civil action . . . brought by or against the United States in any
> court having jurisdiction of that action, unless the court finds that the position of
> the  United States was substantially justified or that special circumstances make an
> award unjust.

28 U.S.C. § 2412(d)(1)(A).  The EAJA is "strictly construed in favor of the government," as "it

effectively amounts to a partial waiver of sovereign immunity by the United States."  Castañeda-

Castillo, 723 F.3d at 57.  To secure an award pursuant to this statute, a party must establish

eligibility by satisfying a series of requirements.  See id. (listing four criteria).  The Court

addresses two of them now.[17]

---

[17] The First Circuit has identified four prerequisites.  Castañeda-Castillo, 723 F.3d at 57.  One
concerns the timing of an EAJA request, essentially setting a deadline of thirty days after final

26

Peruano is plainly "the prevailing party" in a "civil action."  This factor has two components: Has Peruano prevailed, and is this a civil action?  The answer to each is "yes."  It is beyond dispute that Peruano was "awarded some relief" by this Court, that this action yielded "a material alteration of the legal relationship of the parties," and that this Court's "judicial imprimatur" was required to effect that change.  See id. at 57 (quoting Aronov v. Napolitano, 562 F.3d 84, 88 (1st Cir. 2009)).  The "relief" was Peruano's release.  The "material alteration" of the parties' "legal relationship" was the respondents' involuntary surrender of their jurisdictional challenge and their position that Peruano was subject to mandatory detention.  And the "judicial imprimatur" was two-fold: this Court's January 30 order requiring Peruano's interim release, and the instant Order allowing her petition and making release a component of the final judgment in this case.  Peruano has prevailed.  And "[i]t is well settled that habeas corpus is a civil proceeding."  Browder v. Dr., Dep't of Corr. of Ill., 434 U.S. 257, 269 (1978).  For reasons recently explained by the Third Circuit in this very context, "the EAJA unambiguously applies to habeas challenges to immigration detention under 28 U.S.C. § 2241."  Michelin v. Warden, Moshannon Valley Corr. Ctr., Nos. 24-2990 & 24-3198, 2026 WL 263483, at *10 (3d Cir. Feb. 2, 2026).[18]

Next, ICE's position was not "substantially justified."  The initial jurisdictional challenge was in no sense justified, as it arose from a false statement in a sworn declaration concerning a

---

judgment.  28 U.S.C. § 2412(d)(1)(B).  This requirement should pose no obstacle in this case assuming Peruano timely submits the necessary information.  It also appears unlikely that the fourth inquiry—whether special circumstances render a fee award unjust—will bar an award here, considering the sequence of events described in this Memorandum and Order.

[18] The First Circuit has not yet squarely addressed the "civil action" question in this context.  The Court agrees with and adopts here the Third Circuit's reasoning in its entirety, including its analysis of the decisions of other Courts of Appeals on this issue.  See Michelin, 2026 WL 263483, at *1–10, 13.

27

fact known to ICE.  Had ICE correctly reported the plane's departure time to its counsel from the start, little further litigation would have been necessary.  Instead, a series of declarations, status reports, document submissions, and evidentiary hearings ensued.  This consumed substantial time and resources on the parts of the Court, Peruano's counsel, and the USAO, all because ICE made a careless mistake and then doubled and tripled down on it.

Beyond that, ICE was not justified in treating Peruano as subject to mandatory detention in the first place, and it was surely on notice of that fact—and the state of the law in the First Circuit in this regard—well before she filed her petition.  See Guerrero Orellana v. Moniz, No. 25-cv-12664, 2025 WL 3687757, at *1 (D. Mass. Dec. 19, 2025); cf. Bernardo-Rodrigues v. Hyde, No. 25-cv-00553, 2026 WL 370863, at *2 (D. Me. Feb. 10, 2026) (noting government had "opposed every challenge of this kind" asserted in habeas petitions brought by detained noncitizens "even after each district judge in" Maine had "found for petitioners in like cases").  This legal landscape powerfully undermines any justification for treating Peruano—for months—as though she were subject to mandatory detention.

In sum, ICE was not substantially justified in treating Peruano as though she were ineligible for bond, and its opposition to her habeas petition—including, as it has, a series of inaccurate submissions to the Court—has been unjustified at every turn.  Because Peruano is the prevailing party in a civil action in which the government's position was not substantially justified, she is entitled to an award of fees and costs under the EAJA.  She is independently and also entitled to such an award as a sanction for ICE's recurrent false submissions.  The Court intends to order ICE, specifically, to pay any and all fees and costs awarded in this case.  Further

information is necessary to determine the amount of that award, and the Court will receive it on the schedule outlined below.[19]

III.   CONCLUSION & ORDERS

As explained above, Peruano's petition (Doc. No. 1) is ALLOWED, and the Court hereby awards her the following relief:

1) Peruano's interim release pending resolution of her claims is hereby made permanent.

2) The respondents shall not retaliate against Peruano for the filing of this habeas petition or for any of her declarations or submissions in connection herewith.

3) The respondents shall not re-detain Peruano by invoking 8 U.S.C. § 1225.

4) The respondents shall not re-detain Peruano pursuant to § 1226(a) without: a) an individual and articulable change in circumstance that is material to assessing the risk of flight or danger to the community they believe she poses, and b) prompt notice to Peruano and her immigration lawyer concerning the reason(s) for detention, if the respondents re-detain Peruano consistent with this Order.

5) If ICE has not already done so, it shall within seven days of this Order make arrangements with Peruano's counsel for the return of Peruano's clothing, identification documents, and any other property seized from her at the time of her arrest.

---

[19] Though Peruano invoked the EAJA at the outset, in the prayer for relief contained in her petition, the respondents thus far have not addressed it.  As noted, the Court finds that the circumstances before it warrant a fee award on two separate and independently sufficient grounds: the EAJA, and as a sanction for repeated false and misleading statements by ICE in this case.  The respondents may advance, and the Court will consider, any challenge they wish to make to the application of the EAJA in this case, including as to those issues the Court has addressed in this Memorandum.  As far as ICE's false and misleading statements are concerned, the respondents have had ample occasion to dispute, explain, and justify those submissions already, including through the testimony of the ICE officer responsible for most of them.  Cf. Pimentel-Soto, 57 F.3d 82, 85–86 (1st Cir. 2020) (noting "district court's inherent power to control and regulate proceedings" and "considerable latitude . . . in issuing sanctions," so long as court "listen[s] before sanctioning"); Chambers v. NASCO, Inc., 501 U.S. 32, 44–45 (1991) (describing federal court's "inherent power" "to fashion an appropriate sanction for conduct which abuses the judicial process," including by assessing attorney's fees in response to party's bad-faith litigation conduct).

It is further ORDERED that ICE is SANCTIONED as follows.  Within seven days of this Order, the respondents shall file a notice on the docket stating that copies of this Memorandum and Order have been provided to the following persons:  1) Sullivan; 2) Field Office Director David Wesling; and 3) the supervisor of the federal litigation unit at OPLA.  As to Sullivan, the notice shall also state that the contents of this Memorandum and Order, insofar as they address his conduct, statements, and testimony, have been explained to him by counsel.

Finally, it is ORDERED that, within seven days of this Order, Peruano may submit "an itemized statement" evidencing "the actual time expended and the rate at which fees and other expenses were computed," as required by the EAJA, and any other information supporting the fees and costs to be awarded.  See 28 U.S.C. § 2412(d)(1)(B).  The respondents may file an objection within seven days of Peruano's submission.  The Court will then resolve the fee award or invite further briefing if necessary.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge

30